| | |
|---|---|
| 1 | TIFFANY DEHEN J.D. |
| 2 | 1804 GARNET AVENUE #239<br>SAN DIEGO, CA 92109 |
| 3 | 858-262-0052<br>tiffany.dehen@gmail.com |
| 4 | |
| 5 | Pro Se Plaintiff |

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TIFFANY DEHEN**, an individual on behalf of herself,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN DOES 1-100, TWITTER, INC., UNIVERSITY OF SAN DIEGO, AND PERKINS COIE, LLP.,**<br><br>Defendants. | Case No.: 17-cv-00198-LAB-WVG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

1

Mem. of Points and Authorities ISO
Plaintiff's Opposition               No.: 17-cv-00198-LAB-WVG

# INTRODUCTION

Pro Se Plaintiff Tiffany Dehen ("Plaintiff") has stated several – and can continue to state more – claims as to Defendants John Does 1-100, Twitter, Inc., University of San Diego, and Perkins Coie, LLP. The Court should deny Defendants' Motions to Dismiss the Second Amended Complaint, or in the alternative, grant Plaintiff leave to amend.

## Twitter

As explained in Plaintiff's Second Amended Complaint ("SAC"), on October 9, 2015, Plaintiff entered into a written contract with Twitter in order to use Twitter's platform for social networking, now one of the current leading town squares of ideas. Ironically, Plaintiff's overwhelming motivation for rejoining the flawed social networking platform she left years prior was to follow and tweet to then-Presidential Candidate Donald J. Trump and supporters of Mr. Trump's Make America Great Again movement, evidenced by her early tweets to and follows of Donald J. Trump (@realdonaldtrump), individuals close to him, and influential individuals supportive of him and his movement.

Ms. Dehen tweeted and continues to tweet to President Donald J. Trump all the time. Ms. Dehen literally only started using Twitter again because of Mr. President Donald J. Trump (then Presidential Candidate). The fact that John Doe tweeted damaging tweets to Mr. Donald J. Trump is significantly more damaging than the heinous nature of the illegal account to begin with because Plaintiff has been working towards working with Mr. President Donald J. Trump since he announced his presidential campaign in 2015. The amount of damages Plaintiff is entitled is not to be taken lightly, especially considering the fact Mr. President Donald J. Trump is a billionaire.

   Twitter exacerbated treble statutory and punitive damages by failing to follow through with its contractual obligations for days, denying fraudulent misrepresentation when its racketeering scheme backfired because Plaintiff commenced this legal action in federal district court and is attacking CDA § 230, and is now obstructing legal requests made by Plaintiff Ms. Dehen of evidence for this lawsuit in United States Federal District Court. Perkins Coie is aiding and abetting Twitter, Inc. in the commission of unconstitutional and illegal behavior on many levels and is now liable to Plaintiff for damages as well.

   As stated clearly in Plaintiff's SAC, on or about January 26, 2017, John Doe(s) created an illegal Twitter account in Plaintiff's true and legal name and engaged in the illegal activities complained of in Plaintiff's SAC, including explicit terroristic threats aimed towards Ms. Dehen and her dog.

   On January 30, 2017, Plaintiff submitted an impersonation report for the account impersonating her and blatantly violating several of Twitter's Terms of Use and explicit policies to Twitter, including Twitter's parody policy. Immediately following receipt of Plaintiff's impersonation report, Twitter responded to Plaintiff with an automatically generated email "asking for additional information in order to investigate her claims." *See* Perkins Coie LLP.'s Mem. of Points and Authorities ISO Motion to Dismiss SAC page 1, paragraph 2 on behalf of Twitter.

   In Perkins Coie's own words, Twitter requested additional information in order to investigate Plaintiff's claims that the @TiffanyDehen twitter account was in fact impersonating Pro Se Plaintiff Tiffany Dehen, which is a violation of Twitter's Terms of Use, one that Twitter specifically outlines a process by which it handles Impersonation Claims. Pursuant to Twitter's Impersonation Report Policy, Twitter will

3

Mem. of Points and Authorities ISO
Plaintiff's Opposition         No.: 17-cv-00198-LAB-WVG

investigate an account "upon receipt of an impersonation report." *Please see* Twitter's Exhibit G Page 55.

Twitter's Answer Exhibit G page 55 contains Twitter's Impersonation Policy with the same language Plaintiff provided to this Court in her SAC.

> Upon receipt of an impersonation report, we will investigate the reported accounts to determine if the accounts are in violation of the Twitter Rules (https://help.twitter.com/en/rules-and-policies/twitter-report-violation). Accounts determined to be in violation of our impersonation policy, or those not in compliance with our parody, commentary and fan account policy (https://help.twitter.com/en/rules-and-policies/parody-account-policy), will either be suspended or asked to update the account(s) so they no longer violate our policies. Reporting an impersonation account is separate from account verification. Read more about verified accounts (https://help.twitter.com/en/managing-your-account/about-twitter-verified-accounts).

*Please see* Twitter's Answer to SAC Exhibit G Page 55.

Twitter does not state that it will "ask for additional information in order to investigate users' claims upon receipt of an impersonation report," including in the form of a government issued identification card before proceeding with any investigation into the reported account. If Twitter's policy is that it will "'ask for additional information in order to investigate' users' claims upon receipt of an impersonation report in the form of a government issued identification," then why does Twitter explicitly represent and promise in its Terms of Use that it will investigate reported accounts upon receipt of an impersonation report?

4

Mem. of Points and Authorities ISO
Plaintiff's Opposition                    No.: 17-cv-00198-LAB-WVG

Plaintiff alleges the fact that Twitter's immediate response "upon receipt of Plaintiff's impersonation report" is automatic and computer generated, which further shows Twitter's intent to not investigate upon receipt of an impersonation report, as Twitter explicitly promises to do. Plaintiff relied upon Twitter's promise and entered into the Terms of Use with good intent and the expectation that the implied covenant of good faith and fair dealing would be adhered to, in addition, of course, to federal and state laws by which Twitter must abide by when doing business in the United States of America.

Notably, Twitter only disabled the account after Plaintiff's lawsuit was public and being tweeted about on Twitter. Twitter admits that it took days to disable the account. Twitter was obviously on notice of the illegal behavior in clear violation of its posted Terms of Use once it disabled the account, and yet Twitter is somehow touting the fact that it took down the account entirely *days after that* as a positive fact for Twitter.

A day is an eternity when it comes to social media. For example, on May 9, 2018 at 5:30 a.m. Mr. President Donald J. Trump tweeted, "I am pleased to inform you that Secretary of State Mike Pompeo is in the air and on his way back from North Korea with the 3 wonderful gentlemen that everyone is looking so forward to meeting. They seem to be in good health. Also, good meeting with Kim John Un. Date & Place set." *See* https://twitter.com/realDonaldTrump/status/994192995737096192.

As of May 10, 2018 at 7:08 a.m. PST, about 24 hours later, the tweet had 155,377 Likes and 43,849 Retweets. On another note, as an example of Twitter's flawed algorithm, the first reply visible to Plaintiff on this status is from David Hogg @davidhogg111, a left winged activist pushing for gun control ever since the Parkland Shooting to which he was allegedly

5

a witness, which says, "Great work on this! Congratulations" with 3.6k Likes and 169 Retweets.

The second comment visible on this tweet was another tweet from David Hogg that says, "Glad to see you where able to keep this promise unlike most you make," with 2.5k Likes and 125 Retweets. The comments are not displayed in order of retweets or likes, because the seventh comment visible to Plaintiff on POTUS' tweet is from a Katica @GOPPollAnalyst that says, "The Democrats didn't want you communicating with the NK leader. If not for these very communications, we would not have three of our citizens back. Thank you President Trump," with 3.1k Likes and 479 Retweets.

This example not only proves the point that tweets can be seen by thousands, more likely millions, of people in just hours, but also proves the fact that Twitter's algorithm favors certain voices over others. Should this Court require more examples of Twitter's blatant biased of certain voices over others or of how quickly a tweet can spread, Plaintiff is able to provide countless examples.

Notably, Twitter has refused any and all cooperation with Plaintiff. Twitter's refusal to disclose evidence pertaining to John Does 1-100 to Plaintiff is further evidence of Twitter's criminal enterprise scheme to defraud millions of Americans, as well as evidence of Twitter choosing to exercise its First Amendment rights to engage in political speech rather than seeking protection of the CDA § 230 safe harbor since Twitter is protecting John Does 1-100 who might very well consist of the DNC or individuals affiliated with the DNC or working as agents on behalf of the DNC.

Furthermore, Twitter CEO, co-chair and founder Jack Dorsey has been quite open about his political views, as he recently shared and raved about an article calling for democrat victory in a second civil war. *See* http://dailycaller.com/2018/04/07/twitter-jack-dorsey-second-civil-war-trump/. The article Mr. Dorsey called a "great read" claimed there's no "bipartisan way forward" in the United States and the country's engaged in a "fundamental conflict between two worldviews that must be resolved in short order." *Id*. As the Daily Caller article points, the authors of the article Twitter CEO Mr. Dorsey shared calls for complete marginalization of the Republican Party and its voters since they only care "about rule by and for billionaires at the expense of working people" and not "average citizens." *Id*.

As of the date of this filing, Twitter has refused to cooperate with Plaintiff about releasing any identifying information of John Does 1-100 so that Plaintiff may continue with legal proceedings against the true identities of John Does 1-100. Instead, Perkins Coie came to Twitter's rescue, attempting to bar all claims with CDA § 230 and intimidate Plaintiff into dropping her case.

Plaintiff respectfully requests that the record reflect she corrects her SAC claim that there are over 7,000 cases that cite to CDA § 230, but rather the breakdown according to Westlaw is: 691 cases, 61 trial court orders, 108 statutes, 1 regulation, 255 administrative decisions & guidance, 3,358 secondary sources, 873 appellate court documents, 1,798 trial court documents and 1 arbitration award. *Please see* Exhibit 152.

Barely three weeks following commencement of legal proceedings in federal district court, Plaintiff was involved in a serious automobile collision which totaled her Volkswagen Jetta when a driver by the name of

7

Mem. of Points and Authorities ISO
Plaintiff's Opposition                            No.: 17-cv-00198-LAB-WVG

Rachel Wasserman t-boned Plaintiff's car on the driver's side wheel axel just above the driver door. Plaintiff alleges Ms. Wasserman was looking down at her phone, corroborated by evidence submitted to the insurance company handling the case. Ms. Wasserman alleged she was not texting at the time of impact, despite witnesses aside from Ms. Dehen claiming that Ms. Wasserman was looking down at the time of impact. Plaintiff was so scared that the automobile collision was in some way intentionally related to the behavior for which these causes of action arose that she went to the San Diego Police Department the following day in a second attempt to get a police report taken. SDPD refused and Ms. Dehen called the FBI frantically.

Ms. Dehen is friends with Steve Bannon's nephew from high school, whom she contacted after contacting the FBI following her accident in an attempt to get in touch with someone in the FBI or Secret Service who could help her situation since she feared for her life. Steve Bannon was at the time President Donald J. Trump's Chief of Staff in the White House. After Plaintiff spoke with Mr. Bannon's nephew, he was personally solicited a fake porn website using Ms. Dehen's website about her case (www.TiffanyDehen.com) as the click bait.

## CDA § 230 IS UNCONSTITUTIONAL

Section 230 of the Communications Decency Act ("CDA") begins with a statement of findings and a statement of policy, in subsections 230(a) and (b), respectively. *See* 47 U.S.C. § 230.

The findings are rather general, but they illustrate Congress' appreciation for the Internet as a "forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad adventures for intellectual activity," which "ha[s] flourished, to the benefit

of all Americans, with a minimum of government regulation." *See* 47 U.S.C. § 230(a)(3)-(4).

Congress further expressed, "[i]ncreasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services." *See* 47 U.S.C. § 230(a)(5).

CDA § 230 provides, in relevant part, as follows:

> (c) Protection for "Good Samaritan" blocking and screening of offensive material.
> (1) Treatment of publisher or speaker. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
> (2) Civil liability. No provider or user of an interactive computer service shall be held liable on account of—
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1) [subparagraph (A)].

*See* 47 U.S.C. § 230(c).

Section 230 further provides the following in relevant part:

> Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

*Id.* At § 230(e)(3).

Section 230 further states in relevant part as follows:

9

> (1) Internet. The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.
> (2) Interactive Computer Service. The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.
> (3) Information Content Provider. The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.
> (4) Access software provider. The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:
> (A) filter, screen, allow, or disallow content;
> (B) pick, choose, analyze, or digest content; or
> (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

*See* 47 U.S.C. § 230(f).

On or around April 10, 2018 Mark Zuckerberg, C.E.O. of Facebook, another company claiming protection of the safe harbor, testified before Congress. Although Mr. Zuckerberg was not under oath, when questioned by Senator Ted Cruz (R-TX) about whether or not Facebook is a "neutral public forum" or "engaging in political speech in exercise of its First Amendment rights," Mr. Zuckerberg evaded answering the question. When explained by Senator Cruz that Facebook could not be both and still claim protection of the CDA § 230, Mr. Zuckerberg responded that he was not familiar with the legal language.

CDA § 230 is stated above. Mr. Zuckerberg is the C.E.O. of Facebook, who uses CDA § 230 as a defense to all types of lawsuits, just

10

like Twitter. Mr. Zuckerberg is either an irresponsible C.E.O. ignorant of the most beneficial law for his company, or he lied. Plaintiff alleges Mr. Zuckerberg's testimony further demonstrates why CDA § 230 is unconstitutional and needs to be stricken down immediately.

### CDA § 230 DOES NOT APPLY TO TWITTER ANY MORE

Twitter is no longer a neutral public forum able to claim protection of CDA § 230. As stated above, Twitter has clear bias shown through its algorithm and C.E.O.'s personal views against an entire group of people who have actually been silenced, and continue to be silenced and demonetized, on its platform. On the other hand, voices with one viewpoint are protected at the expense of others. For example, Twitter allowed death threats against FCC chair ahead of net neutrality vote. *Please see* https://www.infowars.com/twitter-allows-death-threats-against-fcc-chair-ahead-of-net-neutrality-vote/.

John Does 1-100 could consist of individuals who are not even located in the United States of America, in which case Perkins Coie and Twitter are protecting non-American citizens at the expense of American citizens' freedom of speech, such as Plaintiff here where she was quite literally physically and verbally intimidated out of speaking freely at the current town square of ideas. American citizens should be able to exercise their First Amendment right to free speech on public forums, and American universities for that matter, without being stalked and harassed by self-proclaimed enemy combatants of the United States and being threatened with terroristic threats meant to harm them.

### Perkins Coie, LLP

According to Andrew C. McCarthy with the *National Review*, the Clinton campaign and the DNC paid $9.1 million to Perkins Coie during

11

the 2016 campaign (between mid-2015 to late 2016). *Please see* https://www.nationalreview.com/corner/scandals-collide-dossier-dnc-server-perkins-coie/. Mr. McCarthy states, "Perkins Coie also retained CrowdStrike, the cyber security outfit, upon learning in April 2016 that the DNC's servers had been hacked." *Id.* "[T]he Obama Justice Department decided not to issue a subpoena to demand that the servers be turned over (just like the Obama Justice Department decided not to issue subpoenas to demand the surrender of critical physical evidence in the Clinton e-mails investigation)." *Id.* "Instead, the conclusion that Russia is responsible for the invasion of the DNC servers rests on the forensic analysis conducted by CrowdStrike. Rather than do its own investigation, the FBI relied on a contractor retained by the DNC's lawyers." *Id.* Mr. McCarthy wraps up his article by stating, "[b]ut it certainly is interesting that we are once again, in a case involving alleged Russian espionage, reviewing a situation in which the FBI relied on a contractor retained by the DNC's and the Clinton campaign's lawyers at Perkins Coie." *Id.*

The *New York Times*, with Maggie Haberman contributed reporting, reports Clinton Campaign and Democratic Party Helped Pay for Russia Trump Dossier. *Please see* https://www.nytimes.com/2017/10/24/us/politics/clinton-dnc-russia-dossier.html. Reported on October 24, 2017, "[t]he presidential campaign of Hillary Clinton and the Democratic National Committee paid for research that was included in a dossier made public in January that contained salacious claims about connections between Donald J. Trump, his associates and Russia." *Id.* "Perkins Coie was paid $12.4 million to represent the Clinton campaign and the D.N.C. during the 2016 campaign, according to filings." *Id.*

"Marc E. Elias [Perkins Coie], a lawyer representing the Clinton campaign and the DNC, retained Fusion GPS, a Washington firm, to conduct the research." *Please see* https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html?utm_term=.9bff1dc02404.

"The Obama campaign organization, Obama For America, paid nearly a million dollars to the same law firm that the Hillary Clinton campaign and the DNC used to funnel money to Fusion GPS, the firm that produced the Trump dossier, according to a new report." *Please see* http://www.breitbart.com/big-government/2017/10/29/report-obama-campaign-paid-same-clinton-dnc-law-firm-fusion-gps/. "House Oversight Committee Chairman Trey Gowdy (R-SC) told *Fox News Sunday* he was interested in investigating the Clinton campaign and the DNC. "I'm not an election law expert, but the good news is you don't have to be to understand the absurdity believing you can just launder all of your campaign money by just hiring a law firm…I can't think of anything that defeats the purpose of transparency laws more than that."" *Id.*

Perkins Coie has been accused of aiding and abetting its clients on more than one occasion, as referenced in the Nunes Memo and several other individuals, such as Natasha DeLima case No. 17-CV-733 in United States District Court in Concord, New Hampshire, as well as Isaac Green. *Please see* https://www.antischool.us/single-post/2018/05/04/Ryan-Mzarik-of-Perkins-Coie-Refuses-To-Settle-Virtual-Property-Theft-Case---YouTube. Perkins Coie has fraudulently misrepresented to Ms. DeLima and continues to engage in illegal behavior on behalf of its clients in Ms.

13

DeLima's case. *Id*. Mr. Green sued YouTube, Google, and a few more defendants for demonetizing his YouTube channel and quite literally shutting down more than one of his YouTube channels for questioning the fake news narratives, such as the official story of the Parkland Shooting. *Id*. It is time for the illegal free-for-all Perkins Coie has been engaged in with its clients to come to an end, as Perkins Coie is quite literally being accused of engaging in treason, which is understandable considering the facts of this case where Perkins Coie is attempting to intimidate an American citizen law graduate and prevent her from exercising her First Amendment right, as well as prevent her from having her day in court.

Plaintiff is submitting at the same time as this opposition a signed service of waiver form from Perkins Coie. As of the date of this filing, May 11, 2018, Plaintiff has not yet received an answer from Perkins Coie on behalf of Perkins Coie. As such, Plaintiff moves for a default judgment under Fed. R. Civ. P. 55.

### University of San Diego

University of San Diego's Motion to Dismiss is laughable. Not only did Plaintiff and USD have a written contract, but Plaintiff relied on USD's numerous explicit written representations in deciding to attend USD, as well as the fact that USD would abide by federal, state and local laws, especially those relating to terrorism.

As Plaintiff clearly stated in her SAC, the nucleus of major events leading up to this cause of action occurred on USD campus with USD students and faculty. As outlined in Plaintiff's SAC, USD administration continued to make express promises that it continued to break, thus engaging as an enterprise in a pattern of racketeering activity under the RICO act.

Depending on what the direct evidence shows during discovery, Plaintiff reserves the right to bring any and all additional claims against USD including, but not limited to, obstruction of justice, aiding and abetting a terrorist organization, perjury, etc.

Just because USD's lawyers appear to misunderstand Plaintiff's claims does not mean they are not valid. To the contrary, in light of the events that actually transpired on campus at USD, in connection with USD law students, USD faculty and USD administration, the summary of facts given in Plaintiff's SAC is short and concise.

This wouldn't be the first time USD is alleged to have botched an important investigation relating to the safety of its students. For example, USD has been accused of "botching a dormitory rape case". *Please see* http://www.latimes.com/local/lanow/la-me-usd-lawsuit-20160902-snap-story.html. As the article from September 2, 2016 explains, "[a] former University of San Diego student is suing the school, saying she was drugged, choked and raped in her dorm room and the school mishandled the investigation." *Id.*

A second article states that USD was battling two lawsuits in 2015 charging the school of discouraging sexual assault reports. *Please see* https://www.sandiegoreader.com/news/2015/jul/16/ticker-meanwhile-usd-allegedly-awakens-rape-perps/#.

Dated: May 11, 2018

Respectfully submitted,

Tiffany L. Dehen

1804 Garnet Avenue, #239

15

Mem. of Points and Authorities ISO
Plaintiff's Opposition     No.: 17-cv-00198-LAB-WVG

Pacific Beach, CA 92109

Tel. 858-262-0052

Tiffany.Dehen@Gmail.com

Pro Se Plaintiff.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on May 11, 2018 by express delivery with signature confirmation, postage pre-paid, to all current and/or opposing counsel of record, if any to date, who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule 5.4(d).

**Dated May 11, 2018**

Tiffany L. Dehen
Pro Se Plaintiff.